[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 11-14864
_____

D.C. Docket No. 1:09-cv-00283-KD-C

JODY O'NEIL HARRISON,

Plaintiff - Appellant,

versus

GRANTT CULLIVER,
SYLVESTER FOLKS,
et al.,

Defendants - Appellees,

_____

Appeal from the United States District Court
for the Southern District of Alabama
_____

(April 2, 2014)

Before CARNES, Chief Judge, TJOFLAT, Circuit Judge, and MARRA,* District
Judge.

---

* Honorable Kenneth A. Marra, United States District Judge for the Southern District of
Florida, sitting by designation.

TJOFLAT, Circuit Judge:

This appeal arises out of an inmate-on-inmate assault that occurred on August 6, 2008, at the W.C. Holman Correctional Facility ("Holman") in Atmore, Alabama. The plaintiff, Jody O'Neil Harrison,[1] was assaulted with a knife by another inmate, Dale Pounders, who cut Harrison's throat, nearly killing him. Harrison, proceeding pro se, brought this action against Warden Grantt Culliver, Deputy Warden Sylvester Folks, Captain David Craft, and Officer Allen Lang, seeking damages under 42 U.S.C. § 1983[2] for the injuries he received on August 6. According to Harrison's complaint, these defendants were deliberately indifferent to the substantial risk of serious harm Harrison faced at the time of the assault, in violation of the Eighth Amendment.[3]

---

[1] Harrison was serving a sentence for first degree robbery, which he began serving in August 1995.

[2] 42 U.S.C. § 1983 provides, in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

[3] The Eighth Amendment prevents the government from inflicting "cruel and unusual punishment," U.S. Const. amend. VIII, and is made applicable to the States via the Due Process Clause of the Fourteenth Amendment, Wilson v. Seiter, 501 U.S. 294, 296, 111 S. Ct. 2321, 2323, 115 L. Ed. 2d 271 (1991).

The defendants denied liability and moved the District Court for summary judgment. The court granted their motion and gave the defendants judgment. Harrison appeals the judgment. We affirm.

## I.

The record before the Magistrate Judge on summary judgment consisted of statements Harrison and another inmate made under penalty of perjury pursuant to 28 U.S.C. § 1746,[4] an inmate's affidavit, affidavits of the defendants, copies of the prison's policies governing searches of inmates and the operation of the hobby craft shop, copies of reports of inmate incidents, and copies of two order forms inmates sent to outside vendors for the purchase of utility knives. In subpart A, we recount the August 6 assault on Harrison. Subpart B describes the course of the proceedings below.

---

[4] 28 U.S.C. § 1746 provides:

> Wherever, under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit, in writing of the person making the same (other than a deposition, or an oath of office, or an oath required to be taken before a specified official other than a notary public), such matter may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the following form:

> . . .

> (2) If executed within the United States, its territories, possessions, or commonwealths: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date). (Signature)".

3

A.

On August 6, 2008, at approximately 3:20 p.m., Harrison was in line in an area of Holman known as the "back hallway," waiting to receive his medication from the medical prescription pick-up window on the "main hallway," which ran perpendicular to the back hallway. While he stood in line, another inmate, Dale Pounders, came from behind Harrison and cut his throat with a box-cutter blade that was attached to a wooden handle. Pounders then passed the weapon into the hobby craft shop—which is adjacent to the back hallway—through a hole in the security screen that surrounds the hobby shop, and informed a detention officer on the main hallway that he "just cut a rat's throat." Record, no. 69-4, at 11 (quoting Dale Pounders). When asked about the knife, Pounders stated he threw the knife down the back hallway. There is nothing in the record to indicate how Pounders obtained the knife or what materials were used to make it. Detention officers searched for but were unable to find the knife. It was never recovered.

No officer was present on the back hallway at the time of the attack, and the officers on duty in the area at the time were supervising inmates going to the cafeteria and those going to the dispensary to pick up medicine. The back hallway was not a duty post for a detention officer, but detention officers assigned as rovers on the main hallway were also responsible for monitoring the back hallway. A security camera is located on the back hallway, but it does not record video.

4

Instead, the camera feeds footage to a monitor that is manned by a detention officer twenty-four hours a day.  Multiple cameras feed into the monitor, and the monitor displays the cameras in a loop, which leaves periods of time in which the officer is unable to view the security footage of the back hallway.[5]

According to an inmate at Holman, the back hallway is an area of the prison where inmates commonly go to settle disputes because detention officers were not posted there.  However, the record does not bear this assertion out.  From the incident reports produced by the defendants during discovery, it appears that from 2005 until August 6, 2008, only five assaults occurred on the back hallway.[6]  Of these back-hallway assaults, three involved knives, one involved a lock, and one involved no weapon.

### B.

On May 21, 2009, Harrison filed a pro se complaint and a motion to proceed in forma pauperis in the Southern District of Alabama.  The complaint named Warden Culliver, Deputy Warden Folks, Captain Craft, Officer Lang,[7] and a Nurse

---

[5] Warden Culliver disputes that the back hallway is not monitored 24 hours a day, but because we are reviewing the District Court's grant of summary judgment, we view all facts in favor of the nonmoving party, Harrison.

[6] From 2005 to August 6, 2008, a total of 33 assaults involving weapons were reported in the whole facility.

[7] The complaint improperly named "Allen Lane" as a defendant, but this appears to have been a typo.  Officer Lang signed a waiver of summons, which indicates he was on notice of the litigation.

Poindexter as defendants, and alleged that the defendants had deprived Harrison of his Eighth Amendment right not to be subjected to deliberate indifference to a substantial risk of serious harm. The complaint alleged that the defendants were deliberately indifferent in two ways: (1) they failed to provide adequate security on the back hall and (2) they failed to implement and enforce a policy to ensure that inmates could not possess a box cutter or utility knife outside of the hobby shop.[8] Harrison filed a motion to amend his complaint on November 25,[9] which the Magistrate Judge granted on March 19, 2010.

Also on March 19, the Magistrate Judge ordered the defendants to file special reports containing the sworn statements of all individuals with knowledge of the subject matter of the complaint, certified copied of medical or psychiatric

---

[8] The Magistrate Judge granted Harrison's motion to proceed in forma pauperis on May 28 and ordered Harrison to pay a $25.00 fee, which he did on June 6. Once Harrison paid the $25.00 fee, the Clerk forwarded the action to the Magistrate Judge for screening pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A(b). Those sections direct a court, upon the filing of a civil action by a prisoner, to review the complaint to ensure that it raises cognizable claims and is not frivolous. If the court determines the complaint is frivolous, malicious, fails to raise a claim upon which relief can be granted, or raises claims against defendants who enjoy immunity, the court is required to dismiss the action before the defendants are served. The Magistrate Judge determined the complaint was sufficient to satisfy the requirements of 28 U.S.C. §§ 1915(e)(2) and 1915A(b).

[9] The amended complaint again named Warden Culliver, Deputy Warden Folks, Captain Craft, and Nurse Poindexter, but it did not name Officer Lang. The complaint named additional medical professionals as defendants, raising allegations that they had deprived Harrison of his constitutional rights by failing to provide him medical treatment after the attack, but Harrison filed a motion to dismiss these new defendants and Nurse Poindexter from the case, which the District Court granted and dismissed these defendants without prejudice on December 21, 2010. These defendants are not parties to the instant appeal.

6

records, and copies of relevant administrative rules, regulations, and guidelines.

On May 28, Warden Culliver, Deputy Warden Folks, Captain Craft, and Officer

Lang filed their answer and their special report.  The report included affidavits of

each defendant, as well as Holman's standard operating procedures and certified

copies of reports of incidents involving Harrison.  The Magistrate Judge entered an

order converting the special report to a motion for summary judgment and took the

motion under submission.  The order explained the relevant standard of review,

and highlighted that

> except in certain circumstances, a person against whom a motion for
> summary judgment is filed may not rely on the allegations of his
> pleadings.  In other words, a plaintiff against whom a motion for
> summary judgment is filed must oppose that motion by affidavits,
> depositions, answers to interrogatories, admissions, or as otherwise
> provided in the rules.  If a party against whom a motion for summary
> judgment is filed fails to respond, the materials filed by the moving
> party may be taken as true.

Record, no. 42, at 2.

On August 4, 2010, Harrison propounded interrogatories to Warden

Culliver, Deputy Warden Folks, Captain Craft, and Officer Lang.  He also filed a

motion to produce (1) all incident reports relating to assaults on the back hallway,

(2) all incident reports from inmate-on-inmate assaults involving the use of a

weapon, (3) all disciplinary and behavioral reports for Dale Pounders, (4) the

names of the correctional officers assigned to the main hallway on August 6, 2008,

7

(5) all duty shift rosters for August 6, 2008, (6) all known administrative policies governing the use of the back hallway, (7) all employee complaints regarding security hazards on the back hallway, (8) all hobby craft order invoices of inmates assigned to the hobby shop, (9) a list of the inmates assigned as hobby craft wood workers, (10) all policies governing the use of hobby craft tools by inmates, and (11) any standard operating procedures governing hobby crafting. On September 15, 2010, Harrison filed a motion pursuant to Federal Rule of Civil Procedure 56(f)[10] requesting a delay of the disposition of the defendants' motion for summary judgment pending further discovery, arguing that he was unable to meet his burden of pleading without obtaining the documents requested and answers to the interrogatories.

The Magistrate Judge partially granted Harrison's motion for discovery on November 30, ordering the defendants to produce incident reports involving inmate-on-inmate assaults from 2005 to 2010 in which a blade, box cutter, or other cutting instrument was involved; incident reports involving inmate-on-inmate assaults in the back hallway from 2005 to 2010; and guidelines, policies, and

---

[10] Effective December 1, 2010, Rule 56(f) was reclassified as Rule 56(d) with no substantial change. See Fed. R. Civ. P. 56 Advisory Committee Notes to the 2010 amendments. Because Harrison's motion was filed on September 15, 2010, the rule had not yet been reclassified, and thus, his motion was properly filed under Rule 56(f).

procedures related to hobby craft activity.[11]  The Magistrate Judge granted

Harrison's motion to delay ruling on the summary judgment motion pending

production of the documents.  The Magistrate Judge did not address the

interrogatories in his November 30 order, and the defendants never responded to

the interrogatories.[12]  The defendants complied with the Magistrate Judge's order

on February 4, 2011.

On March 2, 2011, Harrison sought leave of court to conduct further

discovery. Specifically, he sought (1) all invoices for purchases of cutting

instruments by inmates assigned to the hobby shop from 2005 to the present, (2) all

invoices for purchases of cutting instruments by inmates assigned the status of

"Wood Worker" from 2005 to the present, (3) all policies related to the dispensing

of cutting instruments, and (4) all policies related to the securing and recovery of

used, broken, or no longer functional cutting instruments.  The defendants

objected, arguing that Harrison's request was not calculated to lead to admissible

evidence, was unreasonable in scope, and was irrelevant insofar as it sought

evidence receipts for after the August 6, 2008, incident.  On April 13, Harrison

---

[11] Because Harrison was assaulted on August 6, 2008, any incident that occurred after that date is not probative of whether Harrison was denied his constitutional rights.  We therefore only consider the incident reports for assaults that occurred prior to the August 2008 assault.

[12] Harrison never filed a motion to compel the defendants to respond to the interrogatories.

9

moved the court for leave to submit an interrogatory to Officer Lang.  The interrogatory contained three questions related to the number of utility blades that inmates ordered from 2008 to 2011, how the blades were dispensed to inmates, and whether a procedure existed that required inmates to dispose of old blades prior to receiving new ones.

On August 26, 2011, the Magistrate Judge issued a report and recommendation recommending that the District Court deny Harrison's March 2 and April 13 motions and grant summary judgment for the defendants.  The Magistrate Judge credited the defendants' testimony of various security measures taken with respect to the back hallway, concluding that Harrison failed to present evidence that a lack of security posed an objectively substantial risk of serious harm and, even if he had, he further failed to show the defendants were deliberately indifferent.  He also concluded that Harrison failed to present evidence that the hobby craft shop posed an objectively serious risk of harm; nor did Harrison establish a link between the operation of the hobby shop and the assaults reported.

Harrison filed objections to the report and recommendation, but on September 22, the District Court, without a hearing, entered an order adopting the Magistrate Judge's report and recommendation, granting the defendants summary judgment and denying as moot Harrison's March 2 and April 13 motions for leave

10

to conduct discovery.  On October 13, the District Court denied Harrion's motion to alter or amend judgment.

Harrison filed a pro se notice of appeal with this court on October 19.  We appointed counsel for Harrison to assist his prosecution of this appeal.

## II.

Harrison argues that the District Court abused its discretion in refusing to grant his March 2 and April 13 requests for leave to conduct additional discovery, which, he claims, left him to rely on two inmate statements, his own statement, and sparse documentary evidence of Holman's "contraband industry."  Appellant's Br. at 26.  But Harrison's argument overlooks the fact that the defendants were required to submit incident reports for all assaults that occurred in the back hallway, as well as all incident reports for assaults involving weapons that occurred anywhere in Holman.  Thus, the only evidence Harrison was unable to obtain related to the purchasing of craft materials and the policies for disposing of used hobby craft blades.

As recounted in part I.B., supra, Harrison filed multiple motions for discovery during the course of the litigation, which the Magistrate Judge granted in part and denied in part.  Also, Harrison's original interrogatories went unanswered, perhaps because Harrison never filed a motion to compel answers and the Magistrate Judge did not, on his own initiative, order the defendants to respond.

11

After the Magistrate Judge disposed of Harrison's original discovery requests, Harrison filed two motions related to discovery. First, he filed a motion seeking discovery of invoices from the purchasing of cutting instruments, policies related to the dispensing of cutting instruments purchased by inmates, or policies related to the securing and recovery of used, broken, or no longer functional cutting instruments. He also moved the court for leave to propound an interrogatory to Officer Lang asking him about the number of box cutters ordered by inmates, how those box cutters are dispensed to inmates, and whether a procedure existed that required inmates to return their old box cutters before new materials were dispensed. The District Court denied both motions as moot after granting summary judgment for the defendants.[13]

The District Court has broad discretion under Federal Rule of Civil Procedure 26 to compel or deny discovery. Josendis v. Wall to Wall Residence Repairs, Inc., 662 F.3d 1292, 1306 (11th Cir. 2011). Thus, we review its denial of discovery for abuse of discretion. Id. "Discretion means the district court has a range of choice, and that its decision will not be disturbed as long as it stays within that range and is not influenced by any mistake of law." Betty K Agencies, Ltd. v.

---

[13] The District Court also denied as moot Harrison's motions for leave to conduct discovery into his claims against the medical professionals, which neither the Magistrate Judge nor the District Court had acted on after Harrison voluntarily dismissed them from the case. Harrison does not appeal the dismissal of these motions.

12

M/V MONADA, 432 F.3d 1333, 1337 (11th Cir. 2005) (internal quotation marks

omitted).  "Accordingly, under the abuse of discretion standard, we will leave

undisturbed a district court's ruling unless we find that the district court has made a

clear error of judgment, or has applied the wrong legal standard."  Josendis, 662

F.3d at 1307 (internal quotation marks omitted).  Moreover, "we will not overturn

discovery rulings unless it is shown that the District Court's ruling resulted in

substantial harm to the appellant's case."  Iraola & CIA, S.A. v. Kimberly-Clark

Corp., 325 F.3d 1274, 1286 (11th Cir. 2003) (internal quotation marks omitted).

We cannot say that the District Court abused its discretion in denying

Harrison the opportunity to seek invoices detailing the craft materials purchased at

Holman and the policies related to the disposal of craft materials.  Harrison already

had evidence of every incident of inmate-on-inmate assault involving weapons.  To

be sure, the additional evidence Harrison sought may have been relevant to his

claims, but he has failed to show, beyond conclusory assertions, how the court's

ruling "resulted in substantial harm to [his] case."  See id.  Absent such a showing,

we will not disturb a court's exercise of discretion to deny discovery requests.  We

therefore move to the question of whether the District Court erred in granting the

defendants summary judgment.

13

III.

We review the District Court's grant of summary judgment de novo, construing all evidence in the light most favorable to the plaintiff, Harrison.  Baby Buddies, Inc. v. Toys R Us, Inc., 611 F.3d 1308, 1314 (11th Cir. 2010).  Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case.  An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party."  Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259–60 (11th Cir. 2004) (citations omitted).

A.

Prison officials have an obligation to protect prisoners from violence inflicted upon them by other prisoners.  "It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety."  Farmer v. Brennan, 511 U.S. 825, 834, 114 S. Ct. 1970, 1977, 128 L. Ed. 2d 811 (1994).  Prison officials must "take reasonable measures to guarantee the safety of the inmates."  Hudson v. Palmer, 468 U.S. 517, 526–27, 104 S. Ct. 3194, 3200, 82 L. Ed. 2d 393 (1984).  Only "[a] prison official's deliberate indifference to a known, substantial risk of

14

serious harm to an inmate violates the Eighth Amendment." Marsh v. Butler
Cnty., Ala., 268 F.3d 1014, 1028 (11th Cir. 2001) (en banc).

Thus, a prisoner-plaintiff must first demonstrate "an objectively substantial
risk of serious harm to prisoners." Id. at 1028–29. Then, the plaintiff must show
that the defendant was deliberately indifferent, which requires the following: "(1)
subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by
conduct that is more than gross negligence." Goodman v. Kimbrough, 718 F.3d
1325, 1331–32 (11th Cir.2013) (internal quotation marks omitted).[14]

"It is well established in this Circuit that supervisory officials are not liable
under § 1983 for the unconstitutional acts of their subordinates on the basis of
respondeat superior or vicarious liability." Cottone v. Jenne, 326 F.3d 1352, 1360
(11th Cir. 2003) (internal quotation marks omitted). Therefore, a plaintiff seeking
to hold a supervisor liable for constitutional violations must show that the
supervisor either participated directly in the unconstitutional conduct or that a
causal connection exists between the supervisor's actions and the alleged
constitutional violation. Id.

> The necessary causal connection can be established when a history of
> widespread abuse puts the responsible supervisor on notice of the
> need to correct the alleged deprivation, and he fails to do so.

---

[14] Our assessment of whether the official acted recklessly is an objective inquiry. See
Marsh, 268 F.3d at 1029.

15

> Alternatively, the causal connection may be established when a supervisor's custom or policy . . . result[s] in deliberate indifference to constitutional rights or when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so.

Id. (alterations in original) (internal quotation marks omitted) (citations omitted).

"The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences." Hartley v. Parnell, 193 F.3d 1263, 1269 (11th Cir. 1999) (internal quotation mark omitted). In other words, "the standard by which a supervisor is held liable in [his] individual capacity for the actions of a subordinate is extremely rigorous." Cottone, 326 F.3d at 1360 (internal quotation marks omitted).[15]

## B.

Harrison raises two claims against the defendants, one related to the alleged failure to provide adequate security on the back hallway and the other related to the alleged failure to secure hobby craft tools. The Magistrate Judge analyzed

---

[15] Moreover, it is not enough to demonstrate that a state official violated a plaintiff's constitutional rights. A plaintiff must also overcome a defendant's assertion of qualified immunity, which requires a showing (1) that the state official violated the plaintiff's federal constitutional right, and (2) that the constitutional right was "clearly established" at the time the state official acted. Pearson v. Callahan, 555 U.S. 223, 232, 129 S. Ct. 808, 815–16, 172 L. Ed. 2d 565 (2009). Because we conclude that Harrison has failed to establish that the defendants violated any of his constitutional rights, "there is no necessity for further inquiries concerning qualified immunity." Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001).

16

Harrison's claim against defendants as two separate counts, likely because that is how Harrison presented the claim in his complaint. However, Harrison was a pro se plaintiff, and a more charitable reading of the complaint can be distilled as follows: by failing to provide adequate security on the back hallway and by failing to implement and enforce policies regarding the use of utility knives in the hobby shop, the defendants created prison conditions that presented a substantial risk of serious harm, and the defendants were deliberately indifferent to the substantial risk that inmates would inflict serious harm on each other in the back hallway via box-cutter type weapons. Harrison does not claim that the defendants were present on the back hallway the day of the attack and failed to intervene.

1.

The evidence demonstrates that Warden Culliver was on notice that inmate-on-inmate assaults occurred on the back hallway; his signature is on each of the incident reports detailing assaults that occurred on the back hallway from 2005 until August 6, 2008. However, the incident reports indicate that only four assaults occurred on the back hallway from 2005 until the day Harrison was assaulted.[16]

---

[16] In his statement, Harrison claims that "To the best of [his] belief and knowledge," there were 20 assaults in the back hallway in 2005, 15 in 2006, 30 in 2007, and five in 2008. Record, no. 40, at 29. We do not credit this statement as creating a genuine issue of fact because the statement itself evinces that Harrison did not rely on his personal knowledge of the incidents that occurred on the back hallway. See Pace v. Capobianco, 283 F.3d 1275, 1278 (11th Cir. 2002) ("Rule 56(e)'s personal knowledge requirement prevents statements in affidavits that are based,

17

"We accept that an excessive risk of inmate-on-inmate violence at a jail creates a substantial risk of serious harm; occasional, isolated attacks by one prisoner on another may not constitute cruel and unusual punishment, [but] confinement in a prison where violence and terror reign is actionable." Purcell ex rel. Estate of Morgan v. Toombs Cnty., Ga., 400 F.3d 1313, 1320 (11th Cir. 2005) (alteration in original) (internal quotation mark omitted). Although assaults did occur throughout Holman, and some did involve weapons fashioned out of a utility knife, box cutter, or razor,[17] the evidence of inmate-on-inmate assault involving weapons does not does not indicate that inmates were "exposed to something even approaching the constant threat of violence." See id. at 1321 (internal quotation marks omitted). Holman is a large institution—according to the District Court's undisputed finding, Holman housed between 830 and 990 inmates during the relevant time period—and the thirty-three incidents involving weapons, only four of which occurred on the back hallway, are hardly sufficient to demonstrate that Holman was a prison "where violence and terror reign." See id. at 1320 (quoting Woodhous v. Virginia, 487 F.2d 889, 890 (4th Cir.1973)).

---

in part, 'upon information and belief'—instead of only knowledge—from raising genuine issues of fact sufficient to defeat summary judgment.").

[17] Of the 33 assaults involving weapons that occurred throughout all areas of Holman between 2005 and the day Harrison was assaulted, 11 involved some sort of weapon fashioned from a razor or box cutter. The incident reports do not clearly indicate whether the knives were made from razors used for shaving or from box cutters in the craft shop.

18

Similarly, Holman's policies for monitoring the back hallway did not create a substantial risk of serious harm. The evidence shows that, although a detention officer was not permanently stationed on the back hallway, at least one was assigned as a rover with responsibility for monitoring the back hallway. In addition, a camera monitored the back hallway, and although it did not record, it provided a live stream that a detention officer monitored twenty-four hours a day.[18] Additionally, Warden Culliver took reasonable steps to reduce the inmate traffic on the back hallway, relocating the Masjid[19] and library to other areas of Holman. The limited number of inmate-on-inmate assaults on the back hallway from 2005 until August 2008 indicates that the area was fairly secure already. Although placing a detention officer on the back hallway to monitor inmates may have improved the security at Holman, Warden Culliver's decision not to do so did not create a substantial risk of harm. Cf. Connick v. Thompson, ___ U.S. ___, ___, 131 S. Ct. 1350, 1363, 179 L. Ed. 2d 417 (2011) ("[Section 1983] does not provide plaintiffs or courts carte blanche to micromanage local governments throughout the United States.").

---

[18] In his declaration, Harrison states that "To the best of [his] belief and knowledge many different cameras feed into this monitor," and the officer in the control cubical has other assigned duties and cannot constantly monitor the monitor. Again, we do not credit this assertion because it is not based on Harrison's personal knowledge. See Pace, 283 F.3d at 1278.

[19] A Masjid is an Islamic place of worship.

19

2.

Harrison has also failed to establish that the defendants created a substantial risk of harm through their lack of oversight of the hobby craft shop. Indeed, the evidence does not demonstrate that the box cutter Pounders used to assault Harrison had been obtained from the hobby shop. It could have been a shaving razor. Thus, we cannot conclude, based on the record, that the alleged lack of oversight created a substantial risk of serious of excessive inmate-on-inmate violence. Nevertheless, assuming arguendo that the knife was a box cutter obtained from the hobby shop, Harrison still fails to present sufficient evidence to survive summary judgment.

Warden Culliver implemented Standard Operating Procedure (SOP) 14-002 in October 2003, which laid out the rules for the hobby shop. SOP 14-002 dictated that no inmate could enter the hobby shop without a current and valid hobby card issued by the recreational officer,[20] and those who had been disciplined within the previous six months were ineligible to receive a hobby card. Shift commanders were responsible for ensuring that inmates did not enter the hobby shop without a current hobby craft card or exit with any tools or hobby craft items. SOP 14-002 directed that inmates be searched when they left the hobby shop. The hobby shop

---

[20] Office Lang was the recreational officer at Holman in August 2008.

20

was to remain locked at all times except when inmates entered or left the area. In addition, detention officers were required to conduct unannounced searches of the hobby shop at least twice per week, and recreational officers were responsible for keeping an accurate record of all inmates assigned to hobby shop, including their assigned storage box number and tool inventory.

Inmates were permitted to order leather and leather-working materials from approved outside vendors. They could also order approved craft tools with prior approval. The approved tools included leather cutting scalpels, exacto knives, skiff knives, and awl scratchers. SOP 14-002 expressly prohibited inmates from purchasing box cutters or utility knives. All tools were to be kept under lock.

Despite the standard operating procedures, at least some Holman staff did not adhere to the prison's policies. One inmate stated that on multiple occasions he and other inmates ordered cutting tools, including utility knives and utility-knife replacement blades, and were able to order and receive replacement blades without returning old or broken tools. The record includes a purchasing order that shows an inmate was able to purchase utility knife replacement blades on June 18, 2007, in direct contravention of SOP 14-002. In addition, one inmate stated that on many occasions the hobby shop was left open and inmates were able to enter and exit the hobby shop freely without being searched.

21

Although the evidence could suggest that the SOP 14-002 was not strictly enforced, there is no evidence to suggest that this was a widespread problem, or that if it was widespread, that Warden Culliver was aware of the extent to which the policies were not enforced. "Our decisions establish that supervisory liability for deliberate indifference based on the implementation of a facially constitutional policy requires the plaintiff to show that the defendant had actual or constructive notice of a flagrant, persistent pattern of violations." Goebert v. Lee Cnty., 510 F.3d 1312, 1332 (11th Cir. 2007). Warden Culliver acknowledged that some staff members might have allowed inmates to keep hobby craft knives in the housing area, but he stated that "this was not the sentiment of the majority of [his] staff." Record, no. 35-1, at 4. Thus, he did not have actual notice of a flagrant, persistent pattern of violations.

The limited number of assaults involving weapons fashioned from box cutters or razor blades—around eleven of a total thirty-three assaults involving weapons over a three year period—is insufficient to establish that Warden Culliver was constructively aware of a pattern of detention officers failing to follow the Standard Operating Procedures. Although we are unable to pin down precisely how many assaults involved box cutters procured through the hobby shop—five incident reports indicate that a box cutter was used, but they do not indicate from

22

where the inmate obtained the box cutter[21]—the record fails to demonstrate that any lapses in oversight of cutting instruments created a substantial risk of excessive inmate-on-inmate violence.

Even if the conditions at Holman created an excessive risk of inmate-on-inmate violence, the defendants were not deliberately indifferent to the risk. Warden Culliver put policies in place to provide oversight of the hobby shop, which, although not strictly enforced, were not ignored. Cf. id. Moreover, the record indicates that inmates who violated SOP 14-002 were disciplined, and inmates who had received a disciplinary write-up within the previous six months were prohibited from entering the hobby shop. Thus, Harrison has failed to present evidence demonstrating that the defendants acted with "more than gross negligence." Franklin v. Curry, 738 F.3d 1246, 1250 (11th Cir. 2013) (internal quotation mark omitted). Having failed to do so, he cannot succeed on his constitutional claim.[22]

---

[21] Six of the incident reports list a razor blade as the weapon, but it appears those reports refer to weapons fashioned from shaving razors.

[22] We note, parenthetically, an independent reason for granting summary judgment in favor of Deputy Warden Folks. In his affidavit, Deputy Warden Folks stated that he was not responsible for the security operation of Holman and that the establishment of hobby craft procedures was not under his purview. Harrison did not dispute this assertion and presented no evidence to the contrary. "If a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion . . . ." Fed. R. Civ. P. 56(e)(2). Thus, independent of the analysis presented above, summary judgment was proper as to Deputy Warden Folks.

IV.

The District Court's grant of summary judgment is, accordingly,

AFFIRMED.